[*General Term, October,* 1872.]

THE MUTUAL BENEFIT LIFE INSURANCE COMPANY *v.* GODFREY HOLTERHOFF, ADMINISTRATOR OF FRANCIS M. DAVIDSON, DECEASED.

Representations made to procure a policy of life insurance (which policy provides that it shall be void if such representations are untrue), that the insured is temperate as to the use of intoxicating liquors and has always been so, will avoid the policy and discharge the insurer, if at the time of procuring such insurance, the insured was addicted to periodical and habitual " spreeing," and the insurance company, its agents, and examining physician were all ignorant of such fact when the premium was accepted and the insurance effected—there being no premium received after knowledge of such fact came to the company.

*Sayler & Sayler,* for plaintiff in error.

*Lincoln, Smith, Warnock & Stephens,* for defendant in error.

YAPLE, J. This is a proceeding in error brought to reverse a judgment rendered by this court in Special Term in favor of the defendant in error and against the plaintiff in error for fifty-seven hundred and thirty-four dollars. The cause was tried by a jury. Many errors of law occurring at the trial are alleged by the plaintiff in error, and it also

claims that the verdict was manifestly against the evidence, and this last alleged ground of error is the only one we find it necessary to pass upon.

On May 4, 1868, the deceased, Francis M. Davidson, effected an insurance upon his life with this company for the sum of $5,000, for a premium then paid of $125, and a like annual premium to be by him thereafter paid during the continuance of the policy.

In the policy, it was stipulated, among other th:ngs. that if the insured should die " by reason of intemperance from the use of intoxicating liquors, . . . this policy shall be void, null, and of no effect." Also, " that if the declaration made by or for the assured, and bearing date May 4, 1868, and upon the faith of whïch this agreement is made, shall be found in any respect untrue, then, and in such case, this policy shall be null and void." Also, " that in every case where this policy shall cease or become null or void, all previous payments made thereon, and all profits, shall be forfeited to the said company."

In his declaration, the insured was asked and answered : " 13 A. Is the party sober and temperate ?" " Yes." " B. Has he always been so ?" " Yes." " 21. Is the party aware that any untrue or fraudulent allegation made in effecting the proposed insurance, will render the policy void, and that all payments of premium made thereon shall be forfeited ?" " Yes."

The intimate friend, George H. Alcoke, to whose name and residence the insured referred in his declaration, was asked and answered in writing as follows : " 3 A. Are his habits of life temperate ?" " Yes." " B. Has he always been temperate ?" " Yes." Alcoke testified on the trial, that he signed this statement at the request of and to accommodate the insured without giving any special attention to the matter. He also stated to the company, that Davidson did not practice any bad or vicious habit tending to shorten life. The insured further answered that he never had any serious sickness, and that Dr. McCarty at-

tended his family. The company's examining physician, Dr. W. W. Dawson, passed the applicant, recommending the company to take the risk, but certified that he was not acquainted with him, and the soliciting agent, John M. Macy, who procured the risk, testified on the trial, that he was not acquainted with Davidson, and there was no evidence in the case to show that he or anybody connected with the company did know him.

On January 31, 1869, the insured died after being confined for a short period to his room and bed. In the proof of loss made out by the deceased's administrator, and by him offered in evidence to the jury, the defendant not at the time objecting, the deceased's physician, Dr. D. W. McCarty, states in writing under oath, as follows: "Of what disease did he die?" "Congestion of the brain." "What were the general symptoms present during the disease?" Great prostration of the nervous system." "What causes, in your opinion, operated to produce the disease or diseases of which deceased died?" "Cold, and derangement of excretory organs *and overstimulation.*" "Was the deceased in the habit of using spirituous liquors? *If so, how did it affect his health?*" Answer, "Periodical—would go for months without liquor—*never had delirium.*"

This proof of loss was gotten up solely by those interested in recovering upon the policy, and it gives no answer to the question, how the use of intoxicating liquors affected the health of the deceased, except it is said that he never had delirium. All the symptoms, except cold, it will be observed, were such as usually attend sickness produced by drunkenness. This physician was not called as a witness at the trial. The defense was that the insured, at the time of effecting the insurance and until his death, was addicted to intemperance and died from the excessive use of intoxicating liquors. Now, those who use intoxicating liquors at all within the purview of such insurance policies, may be divided into three classes.

The *first* drink sometimes, and upon occasions, as it were

more by accident than otherwise, even to intoxication, but in so exceptional a manner that no one can say that they have any habit in regard to such use. They can stop at any time, even take the glass from their lips in the midst of the banquet, and whether such drinking injures the health of those who do it or not, no one can tell with certainty— some think it does, others not. It is obvious that this class would not be embraced in the terms of a policy such as that in this case.

A *second* class acquire a constant appetite for the use of intoxicating liquors, and a regular habit of using them, so that the whole system is kept under the immediate influence of alcoholic stimulants. They are known as constant, habitual drunkards. This class would be within the prohibition of this policy.

A *third* class acquire a constitutionally nervous appetite for alcoholic liquors. It really amounts to a disease. A case is easily recognized by all who are well acquainted with the person. Such persons may remain sober for a month, three, or six months, or even a year at a time, and refuse to taste any intoxicating drinks (they must refuse if they would not get drunk), and then go upon what is called " a spree" of great intensity and lasting for a longer or a shorter period, usually until prostration and sickness, and often delirium, compel a cessation and terminate the "spree." When beginning, or in the midst of such periodical debauch, no earthly considerations or persuasions can arrest the course of the subject or induce him to stop drinking. In this he is strikingly different from the first class above named who use intoxicating liquors. And there are two varieties of "spreers." The *one* is boisterous, is seen everywhere, and seeks out and talks to everybody. The *other* is conscious of his self-degradation and disgrace, and hides himself from observation at his home or room so as not to be seen and not to have his condition and habit known. And few except his family, intimates or neighbors may know or suspect him. I have not mentioned a class of per-

sons, who use intoxicating liquors prescribed as medicine, or who use them at meals, as part of their food, without any observable mental or physical effects.  They do not come within the purview of legal consideration in connection with life insurance.  The classes within such policies are not those whose wills completely regulate and control their use of intoxicating liquors, but those in which the use and habit daily or periodically control and master the will— where desire and appetite contend with and master the wish and judgment to refrain.

The evidence in this case, without recapitulating it (for we do not wish to say anything hurtful to the feelings of his relatives and friends), convinces us that the insured, though an honest and efficient business man when sober, was a "spreer" at the time he effected this insurance and continually up to the time of his death, which, we have no doubt, was caused by a heavy "spree."  And that the insurance company or any of its agents, or examining physician, did not know this fact when his premium was accepted and the insurance effected.  He died during the first year.

The testimony of his being so addicted to intemperance from the use of intoxicating drinks, we regard as overwhelming, and the jury must have acted under some great mistake in their apprehension of the law applicable to the facts.  The physician, McCarty, in the proof of loss, says he never had delirium; but it is proved, that while he was the physician of the family, he never specially treated the deceased until called to see him during his fatal illness.  A physician formerly connected with the hospital, and whose testimony is uncontradicted, swears that he treated him at the hospital twice, if not three times, for *delirium tremens*, one attack being very severe.  It is also proved that he was taken there to be treated from his house, and this is also uncontradicted.

There is still stronger evidence, which need not be quoted.  The testimony occupies some two hundred pages, all of which we have carefully read, and it is all one way, with

but few exceptions and little qualification. The law upon this subject is so well settled as to render the citation of authorities unnecessary. Even when no question is asked the applicant for insurance as to his habits as to drunkenness, and he is intemperate; that fact, if there be no subsequent waiver, will render the policy void on the ground of *concealment.* Bunyon, 45; Bliss, 167.

The judgment will be reversed on the ground that the verdict was clearly against the evidence.